UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
In re:

THE GREAT ATLANTIC & PACIFIC TEA                          **OPINION AND ORDER**
COMPANY, INC., et al.

                                Debtors.
-------------------------------------------------------------------------x
N. PROVIDENCE, LLC,

                            Appellant,

            - against -                                          13-CV-5588 (CS)

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                            Appellee.
-------------------------------------------------------------------------x

Appearances:

Jessie Christine Basner
Jonathan D. Clemente
Andrea Kitzis Smith
Clemente Mueller, P.A.
Morristown, New Jersey
*Counsel for Appellant*

Paul M. Basta
Ray C. Schrock
Andrew Genser
Nathaniel J. Kritzer
Kirkland & Ellis LLP
New York, New York
*Counsel for Debtor-Appellee*

Seibel, J.

Before the Court is the appeal of N. Providence, LLC ("NP") from the Bankruptcy Court's September 26, 2011 bench ruling, (AP Doc. 14),[1] and its March 8, 2012 and June 21, 2013 Orders (AP Docs. 18, 36) (collectively, the "Order"), granting the motion for summary judgment of The Great Atlantic & Pacific Tea Company, Inc. ("A&P"), and denying NP's motion for summary judgment in an adversary proceeding commenced by NP. The Bankruptcy Court held that under the lease between the parties, A&P was not liable for payments during a period when NP was in breach, including payments of taxes for the third quarter of 2011. For the following reasons, the Bankruptcy Court's Order is AFFIRMED.

## I. BACKGROUND

Although this case arises in a lengthy bankruptcy proceeding, the present issue involves little more than a breach of contract dispute between a landlord and tenant. I set forth below only the facts relevant to the disposition of this matter.

### A. Factual Background

NP as landlord and A&P as tenant are parties to a 20-year lease (the "Lease"), dated June 26, 2007, and amended October 23, 2009, for a shopping center located in New Providence, New Jersey. (Compl. ¶¶ 18-20.)[2] Under the terms of the Lease, A&P promised to construct a new facility for itself in the shopping center, and NP agreed to pay A&P a construction allowance for the completion of the work. (*See generally* Lease Art. 7.)[3]

Specifically, Article 7, Section G of the Lease (hereinafter, "Section 7.G"), as amended, provided that NP "shall pay to [A&P]" a $1.9 million construction allowance (the "Construction

---

[1] "AP Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 11-AP-8306.

[2] "Compl." refers to NP's Adversary Complaint filed in the Bankruptcy Court on June 28, 2011. (AP Doc. 1.)

[3] "Lease" refers to the Lease between NP and A&P, dated June 26, 2007, as amended. (AP Doc. 20 Ex. A.)

Allowance") on or before the ninetieth day following the date that A&P opened its store to the

public. (*Id.* § 7.G; Amendment § 9(e).)[4]  The Lease provided that "if [NP] fails to pay" the

Construction Allowance, then A&P's "obligation to pay fixed annual rent and Charges shall

abate . . . until [A&P's] receipt of the Construction Allowance, together with interest on the

unpaid balance thereof at the Lease Interest Rate (as hereinafter defined)." (Lease § 7.G.)[5]  The

Lease further provided that A&P "shall have title to the [] Building and all other Improvements

constructed" until A&P "shall have been fully reimbursed the Construction Allowance." (*Id.*)

   The Lease also required A&P to pay to NP the portion of NP's property taxes

corresponding to A&P's share of floor space in the shopping center. (*Id.* Ex. G at 66.)  Such

payments thus were "Charges," defined as amounts "payable by [A&P] to [NP]" under the

Lease. (*Id.* § 4.)

   On September 24, 2010, A&P opened its store to the public, thereby giving NP ninety

days, or until December 23, 2010, to pay the Construction Allowance. (Compl. ¶ 24.)  On

October 22, 2010, NP secured a loan commitment for $19.2 million from UBS. (*Id.* ¶ 26.)  NP

and UBS established a target closing date of December 16, 2010, several days before the

Construction Allowance was due. (*Id.* ¶ 27.)

   On December 21, 2010, four days prior to NP's projected closing date, A&P, along with

fifty-three other affiliated debtors, filed petitions for chapter 11 relief in the Bankruptcy Court.

(*Id.* ¶ 28; A&P Mem. 2.)[6]  UBS informed NP that it was prepared to proceed with the closing of

---

[4] "Amendment" refers to the First Amendment of Lease, dated October 23, 2009. (*Id.*)

[5] Section 27.A of the Lease defines "Lease Interest Rate" as "nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law." (Lease § 27.A.)

[6] "A&P Mem." refers to Brief of Reorganized Debtors-Appellees. (Doc. 14.)

the loan as soon as A&P assumed the Lease.  (Compl. ¶ 29.)[7]  A&P did not move to assume the

Lease until June 22, 2011, (*see* Bankr. Doc. 1959 Ex. 1),[8] and NP did not pay the Construction

Allowance within the ninety-day period, (Compl. ¶ 30).  As a result, A&P withheld all rent and

Charges due under the Lease from December 23, 2010, until September 29, 2011, when, after a

nine-month delay, NP finally paid the Construction Allowance.  (A&P Mem. 2.)

B. Proceedings Below

On June 28, 2011, NP commenced an adversary proceeding against A&P, seeking a

declaration from the Bankruptcy Court that the Construction Allowance owed to A&P must be

reduced by the amount of rent payments under the Lease that A&P withheld.  (Compl. ¶ 10.)  NP

argued that Section 7.G of the Lease must be read in conjunction with Section 27.A, titled

"LANDLORD'S DEFAULT," which provides that, in the event of NP's default, A&P "may

deduct from fixed annual rent and/or Charges" the amount in default "plus interest on the

outstanding balance," subject to certain limitations.  (*Id.* ¶ 23 (citing Lease § 27.A)[9].)  NP argued

---

[7] NP implies that its failure to close with UBS, and thus to pay the Construction Allowance on time, was A&P's fault for filing for bankruptcy and not immediately assuming the Lease.  (*See* Brief for Plaintiff-Appellant N. Providence, LLC ("NP Mem."), (Doc. 9), 6, 23.)  The Bankruptcy Court found, after an evidentiary hearing, in a decision that NP did not appeal, that the record did not support NP's position that the UBS loan could not be made absent A&P's assumption of the Lease.  (*See* Transcript of the September 26, 2011 Hearing before Bankruptcy Judge Robert D. Drain ("9/26/11 Hr'g Tr."), (AP Doc. 14), 153:18-21.)  In any event, the issue does not affect my resolution of this appeal.

[8] "Bankr. Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 12-BK-24549.

[9] Section 27.A of the Lease provides, in part:

> If [NP] shall be in default hereunder, [A&P] may (i) after thirty (30) days notice that [NP] is in default in the payment of any monies which [NP] is obligated to pay to [A&P] pursuant to the terms of this Lease, deduct the amount thereof plus interest on the outstanding balance from time to time at the greater of . . . nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law (hereinafter called the "Lease Interest Rate") from fixed annual rent and/or Charges . . . .  Notwithstanding the foregoing, whenever [A&P] is permitted under the provisions of Subdivision 27A hereof to offset, withhold or deduct from fixed annual rent and/or Charges, said offset, withholding or deduction shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of fixed annual rent and Charges until a court of competent jurisdiction renders a final unappealable judgment that [NP] is in default under this Lease and thereafter the aforesaid limitation shall no longer be applicable. . . . The aforesaid limitation on the

that Section 27.A of the Lease "clearly contemplates that the abatement referred to in Section 7 shall be deemed a credit against [A&P's] obligations under the Lease." (*Id.* ¶ 9.) The parties cross-moved for judgment on the Complaint.[10]

On September 26, 2011, the Bankruptcy Court heard oral argument on the motions and issued a partial bench ruling on the record in favor of A&P. (*See* 9/26/11 Hr'g Tr. 148:6-154:17.) Judge Drain concluded that "under the plain language of paragraph 7(g) [A&P] has the ability to withhold the payment of fixed annual rent and [] charges until it actually receives the construction allowance." (*See id.* at 150:4-7.) He rejected NP's argument that Section 27.A of the Lease modified Section 7.G and "requir[ed] [A&P] to set-off versus simply withholding and abating the payment of rent until the construction allowance is paid." (*See id.* at 150:16-22, 151:17-20.) But Judge Drain was troubled that "without any offset or deduction . . . there may be a considerable windfall to [A&P] beyond its readily imaginable or conceivable damages." (*See id.* at 154:6-10.) For this reason, Judge Drain ordered additional briefing on "the narrow issue of the enforceability of liquidated damages provisions under New Jersey law as between sophisticated entities such as [NP] and [A&P]." (*See id.* at 154:13-17.)[11]

The parties submitted supplemental briefs on October 26, 2011, and the Bankruptcy Court issued a bench ruling on January 24, 2012, and an Order on March 8, 2012. (*See* 3/8/12

---

offset, recoupment, withholding or deduction from fixed annual rent and Charges shall not apply to Article 7 hereof.

(Lease § 27.A.)

[10] NP sought a declaratory judgment in Count One of the Complaint, and damages from A&P in Count Two. (*See* AP Doc. 1.) A&P moved to dismiss Count Two, moved for judgment on the pleadings as to Count One and asserted a counterclaim for declaratory relief. (*See* AP Doc. 6.) NP answered A&P's counterclaim, opposed the motion for judgment on the pleadings and moved for summary judgment on Count One. (*See* AP Docs. 9, 10.) A&P then opposed NP's motion for summary judgment and moved for judgment on the pleadings on its counterclaim. (*See* AP Doc. 11.)

[11] The Lease provides that it is to be construed according to the law of New Jersey. (Lease Art. 35; *see* 9/26/11 Hr'g Tr. 149:24-25.)

5

Order.)[12]  In the Order, Judge Drain denied NP's motion for summary judgment, granted A&P's

motions in part, and "reserved ruling on whether the amount that [A&P] has withheld under this

provision constitutes, in whole or in part, an unenforceable penalty or whether it constitutes

reasonable damages for NP's breach."  (*See id.* at 2-3.)[13]

On October 16, 2012, NP filed a second motion for summary judgment, asking the

Bankruptcy Court to find that the abatement clause was an unenforceable liquidated damages

provision under New Jersey law, and further arguing that A&P owed NP taxes for nine days of

the fourth quarter of 2010, and for the entire third quarter of 2011.  (*See* AP Doc. 20 at 2 & n.1.)

A&P opposed the motion, arguing that the rent abatement clause is neither a penalty nor a

liquidated damages clause, but instead an enforceable forfeiture provision.  (*See* AP Doc. 21 at

8.)  A&P added that, even if the Bankruptcy Court were to construe the provision as a liquidated

damages clause, the clause was reasonable and thus enforceable under New Jersey law.  (*See id.*

at 10.)  A&P finally argued that it was entitled to withhold tax payments during the period that

NP was in breach of the Lease.  (*See* AP Doc. 22 ¶ 6.)

On December 14, 2012, after hearing oral argument from the parties, the Bankruptcy

Court preliminarily denied NP's motion, but requested additional briefing on A&P's argument

that Section 7.G was a forfeiture provision.  (*See* 12/14/12 Hr'g Tr. 74:13-23.)[14]  Judge Drain

---

[12] "3/8/12 Order" refers to the Order of the Bankruptcy Court, dated March 8, 2012, which reaffirmed the Court's findings made on the record at the September 26, 2011, and January 24, 2012 hearings.  (AP Doc. 18.)

[13] Judge Drain denied NP's motion with prejudice to the extent that it was based on grounds other than that the abatement provision was an unenforceable penalty.  (*See* 3/8/12 Order at 2.)  By disposing of the motion in this manner, Judge Drain preserved for future review the question of whether the abatement provision was enforceable under New Jersey law, but prevented NP from raising new arguments in support of summary judgment.

[14] "12/14/12 Hr'g Tr." refers to the Transcript of the December 14, 2012 Hearing before Judge Drain.  (AP Doc. 25.) At the hearing, Judge Drain concluded that summary judgment was inappropriate because there were "material, factual issues" as to whether Section 7.G was enforceable when viewed "through the prism of the liquidated damages versus unenforceable penalty[] analysis."  (12/14/12 Hr'g Tr. 73:8-16.)

granted A&P leave to move for summary judgment, (*see id.* at 76:3-21), which A&P did on

January 17, 2013, (AP Doc. 26).

On April 30, 2013, the Bankruptcy Court heard oral argument on A&P's motion for

summary judgment and issued a bench ruling in A&P's favor.  (*See* 4/30/13 Hr'g Tr.)[15]  As for

whether the abatement clause is best construed as a liquidated damages, penalty, or forfeiture

provision, Judge Drain concluded that the "only rubric by which to evaluate the effectiveness of

section 7(g) is under New Jersey's law as it applies to forfeiture provisions."  (*See id.* at 58:23-

25.)  Judge Drain noted that the provision "does not provide for the payment of a specific sum as

damages but instead provides that [NP's] right to obtain rent is abated, that is[,] lost."  (*See id.* at

58:13-17.)  On the issue of whether the abatement provision was enforceable under New Jersey

law, Judge Drain concluded that it was, finding that "New Jersey has a strong policy in enforcing

the unambiguous terms of a contract even if they create hardship for one of the parties," (*see id.*

at 59:6-8), that "a court of equity will not interfere with that contract term in the absence of

fraud, accident, surprise or improper practice," (*see id.* at 60:15-19 (quoting *Dunkin' Donuts of

Am., Inc. v. Middletown Donut Corp.*, 100 N.J. 166 (N.J. 1985)), and that there was "no evidence

[] in the record showing" any of those things, (*see id.* at 62:25-63:1).

Judge Drain deferred ruling on NP's argument that it was owed Fourth Quarter 2010 and

Third Quarter 2011 taxes, and ordered the parties to submit additional briefing on the issue.  (*See

id.* at 66:6-67:2.)  The Bankruptcy Court reviewed the parties' submissions, and entered an

Order, dated June 21, 2013, which granted A&P's motion for summary judgment, denied NP's

cross-motion for summary judgment and fixed NP's claim for taxes.  (*See* 6/21/13 Order.)[16]

Judge Drain concluded that NP was entitled to an additional $6,291.22 for Fourth Quarter 2010

---

[15] "4/30/13 Hr'g Tr." refers to the Transcript of the April 30, 2013 Hearing before Judge Drain.  (AP Doc. 42.)

[16] "6/21/13 Order" refers to the Order, dated June 21, 2013, of Judge Drain.  (AP Doc. 36.)

taxes, having already received $58,019.14 in taxes from A&P, but was not entitled to Third

Quarter 2011 taxes.  (*See id.* at 2.)  Judge Drain found that NP had failed to timely assert a cure

claim under 11 U.S.C. § 365 for Third Quarter 2011 taxes,[17] and in any event, that A&P was

allowed to abate these taxes because they became due as a "Charge" under the Lease while NP

was in default.  (*See id.*)

   C. Appeal

        On July 3, 2013, NP filed a timely Notice of Appeal.  (Doc. 1.)  On appeal, NP argues

that the Bankruptcy Court erred in granting summary judgment to A&P and permitting A&P to

withhold all rent and Charges for the nine-month period during which NP failed to pay the

Construction Allowance.  (*See* NP Mem. 11-12.)  Specifically, NP challenges the Bankruptcy

Court's conclusions that:  1) Sections 7.G and 27.A of the Lease do not provide for a set-off or

credit against the Construction Allowance owed to A&P; 2) Section 7.G is an enforceable

forfeiture provision under New Jersey law; and 3) NP was not entitled to Third Quarter 2011

taxes.  (*See id.*)

## II.  DISCUSSION

   A. Legal Standard

        This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final

judgments, orders, and decrees of a bankruptcy court.  A district court reviews a bankruptcy

court's findings of fact for clear error and reviews its legal conclusions *de novo*.  *Overbaugh v.*

---

[17] Section 365 of the Bankruptcy Code allows the "trustee, subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). On June 21, 2011, A&P moved to assume certain unexpired leases, which included the Lease with NP. (*See* Bankr. Doc. 1959 Ex. 1.) With this motion, A&P set forth proposed "cure" amounts, to be paid upon assumption, indicating that the amount owed to NP was $0.00. (*See id.*) NP claims to have filed a limited objection to A&P's motion, (*see* NP Mem. 29), although it appears that NP actually objected to A&P's earlier motion for entry of an order extending the time for A&P to assume or reject the Lease, (*see* Bankr. Doc. 620). Regardless, NP does not assert that it raised the Third Quarter 2011 taxes in any objection to A&P's asserted cure amount, nor could it have done so, because A&P filed its motion to assume before the third quarter of 2011. Nor does NP assert that it later sought these taxes through other means.

*Household Bank N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (per curiam); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree").

   B.   Abatement under Section 7.G

       NP first challenges the Bankruptcy Court's interpretation of Section 7.G of the Lease. (*See* NP Mem. 12-17.)  The Bankruptcy Court held that, under Section 7.G of the Lease, A&P was allowed to withhold rent and Charges without crediting the withheld amounts against the Construction Allowance.  NP argues that the plain language of the Lease, along with the clear intent of the parties, supports interpreting Section 27.A to modify Section 7.G and allow for a set-off of rent and Charges against the Construction Allowance.  (*See id.*)  A&P responds that the Bankruptcy Court correctly interpreted the Lease as providing a "customary abatement, not a set-off right."  (*See* A&P Mem. 6-12.)

       Under New Jersey law,[18] a court examines a lease through the lens of traditional contract interpretation.  *Textron Fin.-N.J. Inc. v. Herring Land Grp., LLC*, No. 06-CV-2585, 2012 WL 1079613, at \*16 (D.N.J. Mar. 30, 2012); *see Mayfair Supermkts., Inc. v. Acme Mkts., Inc.*, No. 87-CV-3994, 1989 WL 32133, at \*7 (D.N.J. Apr. 3, 1989) ("[C]urrent New Jersey law construes lease agreements under the same guidelines employed to interpret contracts.").  The court's objective "is to determine the intent of the parties," *Kieffer v. Best Buy*, 205 N.J. 213, 223 (N.J. 2011), and it must ascribe to the lease's terms their plain and ordinary meaning, *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 191 (N.J. Super. Ct. App. Div. 2002).  "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves."  *Kieffer*, 205 N.J. at 223.

---

[18] NP strangely cites New York cases on the rules of contract interpretation.  (*See* NP Mem. 14-15; A&P Mem. 7.)

Reviewing the plain language of Section 7.G of the Lease, the Court is not persuaded that the parties intended for rent and Charges to be set off against the Construction Allowance. Section 7.G unambiguously states that if NP fails to pay the Construction Allowance, then A&P's "obligation to pay fixed annual rent and Charges shall abate." (Lease § 7.G.)  The term "abatement" is defined as "[t]he act of eliminating or nullifying." *Black's Law Dictionary* 3 (9th ed. 2009).  A&P's obligation to pay rent and Charges was eliminated during the period that NP failed to pay the Construction Allowance.  Thus, the Bankruptcy Court correctly held, under the plain meaning of Section 7.G, that the Lease does not provide for rent and Charges to be set off against the Construction Allowance.[19]

NP argues that Section 27.A of the Lease undermines this interpretation of Section 7.G and requires that the Construction Allowance be set off against the abated rent and Charges. Here, NP relies on two provisions of Section 27.A.  The first states that A&P's right "to offset, withhold, or deduct" amounts when NP is in default is capped at thirty percent of the next month's payment, but that that cap does not apply to Article 7 of the Lease.  (Lease § 27.A.)[20] The second is the definition of "Lease Interest Rate," which is set forth in Section 27.A and

---

[19] A&P further asserts that this outcome is consistent with two cases from New Jersey, *City of Atl. City v. Cynwynd Invs.*, 148 N.J. 55, 63 (N.J. 1997) (no indication that abated rent would be set off), and *Westrich v. McBride*, 204 N.J. Super. 550, 557 (N.J. Super. Ct. Law Div. 1984) (tenant allowed to abate rent in the amount of additional electricity charges), which recognize the right to abate rent without a subsequent set-off. *(See* A&P Mem. 9.)  NP responds that reliance on *Cynwynd* and *Westrich* is misplaced because the tenants in those cases reduced the rent in direct proportion to the damages caused by the landlord's breach, but A&P's abatement is not proportional to its damages.  (*See* Reply Brief for Plaintiff-Appellant N. Providence, LLC ("NP Reply Mem."), (Doc. 15), 1-2.)  But neither *Cynwynd* nor *Westrich* hinged on the proportionality of the abatement to the damages.  The two cases instead affirm that the plain meaning of the term "abate" implies an elimination and not a set-off.

[20] Section 27.A provides that A&P's right to "offset, withhold or deduct . . . shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of fixed annual rent and Charges," but that "[t]he aforesaid limitation on the offset, recoupment, withholding or deduction from fixed annual rent and Charges shall not apply to Article 7 hereof."  (Lease § 27.A.)

applies to Section 7.G by cross-reference.  (*Id.*)[21]  The Court is not persuaded that either

provision warrants a departure from the plain meaning of Section 7.G.

NP first contends that because one provision of Section 27.A – the thirty-percent

limitation on A&P's right "to offset, withhold, or deduct" – does not apply to Article 7, the

remaining parts of the Section must apply to that Article, including Section 7.G.  (*See* NP Mem.

14.)  NP's argument appears to be that there would be no need to carve out Article 7 from the

thirty-percent cap if Section 27.A did not otherwise apply to it in the first place.[22]  While this

argument has some facial appeal, I am unpersuaded.  First, it does not follow that the carve-out

can only mean that the remainder of Section 27.A applies to Article 7.  It would be quite logical

for the parties simply to want to make clear that the thirty-percent cap of Section 27.A does not

apply to Article 7.  In other words, the provision on which NP relies can most reasonably be

interpreted as meaning no more than what it says, without implying that Section 7.G is in fact an

offset provision despite its plain language to the contrary.  Second, there are other provisions in

Article 7 that specifically provide for "offset, recoupment, withholding or deduction" if NP fails

to satisfy the conditions of the Lease, (*see* Lease § 7.A; *id.* § 7.H),[23] and thus it is perfectly

logical for Section 27.A to carve out Article 7 from its thirty-percent cap, without that carve-out

---

[21] Section 27.A defines the term "Lease Interest Rate" as "nine (9%) percent per annum, or if such rate is illegal . . . the highest rate permitted by law."  (*Id.* § 27.A.)  Section 7.G allows abatement until NP pays the Construction Allowance plus interest on the unpaid balance "at the Lease Interest Rate (as hereinafter defined)."  (*Id.* § 7.G.)

[22] NP's argument seems to be a variation on the doctrine of *expressio unius est exclusio alterius*, *i.e.*, "expressing one item of [an] associated group or series excludes another left unmentioned."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (internal quotation marks omitted).  NP argues that the exclusion of one portion of Section 27.A from applying to Article 7 must mean that the remainder of Section 27.A applies to Section 7.G.  It seems to the Court, however, that if the parties so intended, they would have included something to that effect in the Lease, rather than leaving it to a convoluted inference.  In any event, the inference is unwarranted for the reasons stated in the text.

[23] Section 7.A provides that "[i]f [NP] fails to comply with the requirements of [§] 7D(2)] . . . , then [A&P] shall have the right to [] commence or complete . . . such work which [NP] shall have failed to complete . . . and recoup the cost and expense thereof.").  Similarly, Section 7.H provides that "[i]f [NP] shall not have satisfied each of the conditions set forth in [§] 8(A) . . . [A&P] shall have the right [] to . . . commence or complete the satisfaction of . . . the conditions . . . and recoup the cost and expense thereof.").

meaning that every provision of Article 7 constitutes an offset, recoupment, withholding or deduction.

As the Bankruptcy Court found, NP and A&P are "sophisticated parties," (*see* 9/26/11 Hr'g Tr. 153:17), and presumably they knew how to draft a lease. That they chose not to provide for set-off under Section 7.G persuades the Court to reject NP's suggestion that the parties intended for Section 27.A to modify Section 7.G.

The Court is equally unpersuaded by NP's argument that because Section 7.G refers to the term "Lease Interest Rate," and Section 27.A defines the term "Lease Interest Rate," Section 27.A must apply to Section 7.G. (*See* NP Mem. 16-17.) The cross-reference between Sections 7.G and 27.A serves to define the rate at which interest on the Construction Allowance must be paid; it does not imply that Section 27.A otherwise modifies Section 7.G. Contract provisions frequently incorporate definitions from other parts of the contract, and such incorporation has no effect on the substance of the incorporating provision. *Cf. Am. Asphalt Co. v. Cnty. of Gloucester*, No. L-1412-08, 2011 WL 1119064, at *4, *8 (N.J. Super. App. Div. Mar. 29, 2011) (rejecting plaintiff's argument that contract's "generic cross-reference" to New Jersey standards "necessarily subsumed all of the relevant provisions in those [] standards," such that contract allowed for price escalation, which was otherwise contrary to contract's language).

NP also argues that because the parties did not amend Section 27.A when they amended Section 7.G, they intended for Section 27.A to apply to Section 7.G. (*See* NP Mem. 15.) But NP overlooks that A&P's obligation to pay rent and Charges also "abate[d]" under the pre-amendment version of Section 7.G. (*See* Lease § 7.G.) The Amendment to the Lease merely adjusted the amount of the Construction Allowance, reducing it from $2 million to $1.9 million, and the conditions under which rent and Charges abated. (*Compare id.* § 27.A, *with* Amendment

§ 9(e).)  The Amendment provides no basis for inferring that the parties intended to modify the plain abatement language of Section 7.G.

NP finally argues that Section 27.A must apply to Section 7.G to prevent A&P from experiencing a windfall of $949,875.03.  (*See* NP Mem. 15.)  NP asserts that, without set-off, A&P will be allowed to keep the Construction Allowance plus interest, along with the abated rent and Charges, even though A&P had full use of the building during the entire period of NP's breach.  (*See* NP Reply Mem. 2.)  The Court recognizes that A&P may emerge from this dispute with a significant profit, but the Lease contemplates such an outcome, and the Court's task "is not to rewrite a contract for the parties better than or different from the one they wrote for themselves."  *Kieffer*, 205 N.J. at 223.  The Court therefore affirms the Bankruptcy Court's conclusion that Section 7.G provides for an abatement of rent and Charges, without set-off, during the period that NP was in breach of the Lease.[24]

## C.  Section 7.G as an Enforceable Forfeiture Provision

NP next contends that the Bankruptcy Court erred in construing Section 7.G as a forfeiture provision where the Lease did not expressly provide for forfeiture and controlling authority dictates that contracts be construed against forfeiture.  (*See* NP Mem. 18-19.)  NP further contends that, even if Section 7.G is a forfeiture provision, the provision is unenforceable under New Jersey law because A&P was adequately compensated for NP's breach via interest.  (*See id.* at 19-21.)  NP finally argues that a forfeiture provision, similar to a liquidated damages clause, must be reasonable, and here the amount of forfeiture is plainly unreasonable because it

---

[24] This outcome is consistent with the final provision of Section 7.G, which provides that A&P "shall have title to the [] Building and all other Improvements," until NP pays the Construction Allowance.  (Lease § 7.G.)  Because A&P was the title-holder during the period NP failed to pay the Construction Allowance, NP was not entitled to collect rent, *see Four-G Corp. v. Ruta*, 25 N.J. 503, 507 (N.J. 1958) (noting that "rents which accrue before title passes belong to the vendor"), and NP should not be allowed to recoup rent that it was not entitled to collect in the first place.

"does not bear a reasonable relationship to the actual damages sustained by A&P for NP's delay." (*See id.* at 21-27.)

With respect to whether Section 7.G is a penalty, liquidated damages or forfeiture provision, A&P responds that Section 7.G falls squarely within the definition of "forfeiture" because NP "lost its right to collect rent [and Charges]," (*see* A&P Mem. 12), and is "wholly inconsistent with the definition of a 'penalty' under New Jersey law," (*see id.* at 13). A&P adds that, despite NP's argument otherwise, there is no requirement under New Jersey law that a provision use the term "forfeiture" to qualify as a forfeiture provision. (*See id.* at 17.) A&P further argues that courts in New Jersey will not interfere with contract terms, even where the terms create a hardship for a party, absent fraud, accident, surprise, or improper practice, all of which are absent in the present case. (*See id.* at 13-16.) A&P finally asserts that reasonableness has no bearing on whether a forfeiture provision is enforceable under New Jersey law. (*See id.* at 19-20.)

The Bankruptcy Court correctly construed Section 7.G as a forfeiture provision. A "forfeiture" is defined as "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." *Black's Law Dictionary* 722. Section 7.G abates A&P's obligation to pay rent and Charges upon NP's breach of its obligation to pay the Construction Allowance, and thus NP's right to collect rent and Charges is lost, or forfeited, in the event of breach. That Section 7.G does not expressly use the term "forfeiture" does not affect the Court's analysis. *See Dunkin' Donuts*, 100 N.J. at 173 (agreement that "rights of the Licensee [] shall cease" qualified as forfeiture);[25] *Brick Plaza, Inc. v. Humble Oil & Refining Co.*, 218 N.J. Super. 101, 103-05 (N.J. Super. App. Div. 1987) (tenant forfeited right to purchase property where right

---

[25] Despite NP's suggestion otherwise, (*see* NP Mem. 19), the Supreme Court in *Dunkin' Donuts* did not state that a provision must "expressly call" for a "forfeiture" to qualify as a forfeiture provision. *See* 100 N.J. at 182.

to purchase was expressly conditioned on tenant giving "written notice . . . of its intention to exercise such purchase option," and tenant failed to give notice).  Moreover, Section 7.G is plainly inconsistent with the definition of a penalty or liquidated damages clause under New Jersey law because the Section does not provide for a specific sum to be paid in the event of breach.  *See Westmount Country Club v. Kameny,* 82 N.J. Super. 200, 205 (N.J. Super. App. Div. 1964) ("Liquidated damages is the sum a party . . . agrees to pay . . . to estimate in advance the actual damages . . . .  A penalty is the sum a party agrees to pay . . . but which is fixed . . . .").  Rather, the amount of abated rent and Charges will vary based on the length of NP's breach.  Thus, the Bankruptcy Court properly construed Section 7.G as a forfeiture provision.

The Bankruptcy Court also correctly determined that Section 7.G is enforceable under New Jersey law.  *Dunkin' Donuts* remains the seminal New Jersey case on the enforceability of forfeiture provisions.  There the Supreme Court of New Jersey held that "if parties choose to contract for a forfeiture, a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice."  100 N.J. at 182.  The Court in *Dunkin' Donuts* reversed the lower court, which had partially relieved a franchisee from an agreement that divested his entire interest in his franchise based on his breach of the agreement.  *Id*.  The lower court acted to prevent an "inappropriate windfall" to the franchisor, but the Supreme Court held that forfeiture was appropriate where the parties had contracted for such an outcome "in the absence of fraud, accident, surprise, or improper practice."  *Id.*  As in *Dunkin' Donuts*, NP and A&P contracted for a forfeiture and – in the absence of fraud, accident, surprise, or improper practice, none of which NP argues is present – the forfeiture will be upheld, even if it results in a windfall to A&P.

15

NP attempts to distinguish *Dunkin' Donuts* on several grounds, (*see* NP Mem. 21-24),

none of which are persuasive.  NP first argues that, unlike the franchisee in *Dunkin' Donuts* who

intentionally breached the franchise agreement, "NP was delayed in paying the Construction

Allowance due to circumstances beyond its control." (*See id.* at 23.)  But NP provides no

authority for the proposition that this difference matters when deciding whether to enforce a

forfeiture under New Jersey law.  Second, NP argues that forfeiture would be "unconscionable

and unjust" because A&P has been compensated for NP's breach through NP's interest

payments.  (*See id.*)  That the Lease provides a windfall for A&P as a result of NP's breach does

not rise to the level of unconscionability.[26]  Moreover, NP's subsequent remedy of its breach

should not deprive A&P of its bargained-for right to abate rent and Charges.[27]  In sum, the

*Dunkin' Donuts* decision provides controlling authority under which this Court will enforce

Section 7.G as a forfeiture provision.[28]

---

[26] Unconscionability "involves both procedural and substantive elements" and "requires a two-fold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions." *Parilla v. IAP Worldwide Servs., VI, Inc*., 368 F.3d 269, 276-77 (3d Cir. 2004) (internal quotation marks omitted).  Even assuming the first, substantive requirement were met, NP does not argue, nor is there evidence to suggest, that the Lease was procedurally unconscionable, and thus the Court rejects NP's suggestion that the Bankruptcy Court's outcome was unconscionable.

[27] NP cites to three ancient cases from New Jersey, *Galka v. Tide Water Associated Oil Co.*, 30 A.2d 881 (N.J. Ch. 1943), *Commercial Trust Co. v. L. Wertheim Coal & Coke Co*., 102 A. 448 (N.J. Ch. 1917), and *Blake & Co. v. Smidth*, 119 A. 306 (N.J. Ch. 1922), as standing for the principle that the Court should exercise its equitable power to relieve NP from a forfeiture of rent and Charges because NP has fully compensated A&P for its breach. (*See* NP Mem. 21.)  These cases fail to support NP's position.  In *Galka*, the court refused to grant relief from a forfeiture where, as here, the dispute was a legal one under a contract and "no equitable rights nor equitable defenses [were] involved." 30 A.2d at 884.  In *Commercial Trust,* the court had an equitable basis to relieve a lessee from a forfeiture because the lessor had waived all defaults under the lease and was estopped from asserting the default, 102 A. at 452, but equity has no bearing here because NP seeks a remedy at law.  *Blake*, where the court relieved a tenant from a forfeiture for failing to pay rent after the tenant paid back rent, 119 A. at 307, is arguably the closest to the instant case, but the Court is not persuaded that New Jersey courts would strike down the instant forfeiture provision under the *Blake* decision.  First, no cases in New Jersey have cited *Blake* since the 1940s.  Second, it seems to reflect a tenant-friendly interpretation that it might well not have applied at the behest of a landlord.  Third, *Dunkin' Donuts* is now the controlling law and that decision plainly suggests that a forfeiture will be enforced in the present circumstances.

[28] The Court also rejects NP's suggestion that the abatement, if viewed as an interest payment, would violate New Jersey usury laws.  (*See* NP Mem. 28 n.11; NP Reply Mem. 5.)  A&P's rent abatement was not a loan to NP, and the Court sees no reason to extend state usury laws to the present action.

NP also attempts to import a reasonableness inquiry into the Court's forfeiture analysis. NP contends that, under New Jersey law, the "enforceability of a forfeiture provision [must be] judged against the standard of reasonableness." *Rosen v. Smith Barney, Inc.*, 393 N.J. Super. 578, 592 (N.J. Super. App. Div. 2007). NP fails to acknowledge that this language from *Rosen* follows a discussion on contract formation – namely whether "plaintiffs voluntarily entered into the agreement, [and whether] the terms of the investment plans were fully disclosed, the participants were knowledgeable, sophisticated, and could weigh the potential risks against the rewards." *Id.* In other words, the reasonableness inquiry in *Rosen* related to the process by which the parties reached their agreement, not the terms of the agreement. NP does not suggest that the concerns that animated *Rosen* (which in any event cannot trump *Dunkin' Donuts*) are present here. The Court therefore affirms the Bankruptcy Court's finding that Section 7.G is an enforceable forfeiture provision.

## D. Third Quarter 2011 Taxes

NP finally argues that the Bankruptcy Court erred in finding that A&P does not owe $66,669.35 in Third Quarter 2011 taxes. (*See* NP Mem. 28-33.) NP contends that the Bankruptcy Court erroneously found that NP waived its claim to these taxes by failing to "timely assert a cure claim under 11 U.S.C. § 365," and that even if NP had not waived its claim, A&P was not obligated to pay these taxes because they became due as a "Charge" under the Lease while NP was in breach of the Lease for failing to pay the Construction Allowance. (*See id.*)

A&P responds that Third Quarter 2011 taxes were not part of the proceedings below, and that NP needed to assert a separate claim for that amount in the adversary proceeding or as an administrative claim. (*See* A&P Mem. 21.) A&P also argues that even if NP did not need to

17

assert a separate claim for the taxes, A&P's obligation to pay them abated because NP was in breach when they came due.  (*Id.* at 22-23.)

Assuming that NP has not waived its claim to collect Third Quarter 2011 taxes, A&P is not obligated to pay Third Quarter 2011 taxes because these taxes became due as a "Charge" under the Lease during the period when A&P could abate Charges as a result of NP's breach.  As explained above, Section 7.G of the Lease permits A&P to abate payment of rent and Charges during the period of NP's breach, which began on December 23, 2010, and extended through September 2011.  "Charges" are defined in the Lease as "all other charges payable by [A&P] to [NP]," (Lease § 4), which includes taxes A&P owed to NP under the Lease provision requiring A&P to reimburse NP for its proportional share of NP's property taxes, (*id.* Ex. G at 66).  Under the Lease, A&P has to pay NP for taxes thirty days after NP invoices A&P for them.  (*Id.*)  There is no dispute that NP first invoiced the Third Quarter 2011 taxes on August 24, 2011, making A&P's payment due on September 23, 2011.  (*See* AP Doc. 35 Ex. 2.)  Nor is there any dispute that NP was in breach at that time for failing to pay A&P the Construction Allowance.  Thus the Third Quarter 2011 taxes were a Charge that A&P was entitled to abate.  That NP later submitted a second invoice on October 13, 2011, after it had cured its breach, (*see id.* Ex. 3), does not change the fact that NP first invoiced these taxes during the period when A&P had the right to abate these Charges.  For this reason, I affirm the Bankruptcy Court's conclusion that NP is not entitled to collect $66,669.35 in Third Quarter 2011 taxes.[29]

---

[29] Because I find that A&P's obligation to pay taxes abated, I need not address whether NP was required to assert a separate claim, under 11 U.S.C. § 365 or otherwise, and if so, whether NP should be permitted to file a late claim. (*See* NP Reply Mem. 6-9.)

## III.   CONCLUSION

For the reasons stated above, the Order of the Bankruptcy Court is AFFIRMED.  The

Clerk of Court is respectfully directed to docket this decision and close the case.

**SO ORDERED.**

Dated:  April 28, 2014
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.